***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Rowell. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Rowell with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and named employer.
3. The carrier liable on the risk is correctly named above.
4. The parties stipulated that the employee's average weekly wage will be determined from the I.C. Form 22 Wage Chart. Based upon review of the Form 22, which was stipulated to by the parties, it is determined that Plaintiff's average weekly wage is $404.31, yielding a compensation rate of $269.56.
5. Plaintiff sustained an injury on March 3, 2001.
6. Plaintiff sustained a compensable injury by accident arising out of and in the course and scope of her employment, the consequences of which are in dispute.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was a 46-year old female who had completed her GED.
2. At the time of her injury on March 3, 2001, plaintiff was employed by defendant-employer, a company who provides cleaning services to industrial businesses. On March 3, 2001, plaintiff was performing her cleaning service duties for the defendant-employer at the Kelly Springfield plant. Plaintiff's job duties for defendant-employer included mopping, sweeping, collecting and emptying trash, and cleaning restrooms.
3. On March 3, 2001, Plaintiff was exiting a storage closet on her way back to the plant floor when a forklift backed into her. As a result of plaintiff being struck by this forklift, she received multiple contusions to parts of her body including, to both her knees and her back.
4. On March 4 and 6, 2001, plaintiff presented to the Cape Fear Valley Medical Center Emergency Department. Plaintiff was diagnosed on these occasions with blunt trauma with multiple minor contusions and pain. Plaintiff was written out of work until March 8, 2001. Plaintiff was discharged from the Emergency Department on these occasions and was referred for follow-up with Dr. Karen V. Jones, Orthopedic Specialist.
5. On March 8, 2001, plaintiff presented to Occupational Health Services of Cape Fear Valley Medical Center with continued complaints of pain. Plaintiff was again diagnosed with multiple contusions, strains and sprains and was again referred to Dr. Karen V. Jones.
6. Plaintiff was first evaluated by Dr. Jones on March 12, 2001 and continued to receive medical treatment from Dr. Jones until June 4, 2001. Plaintiff's chief complaint to Dr. Jones concerned bilateral knee injury, but plaintiff's primary complaint concerned her left knee more than anything else. During this period of treatment of plaintiff, Dr. Jones found no gross abnormalities, no acute fractures or soft tissue injuries. Dr. Jones recommended that plaintiff have an MRI of her left knee which was performed on May 14, 2001. This MRI revealed no abnormalities, no internal derangement and no apparent injury to the cartilage or meniscus. Based upon the examinations of plaintiff by Dr. Jones, there were no objective findings found to support or explain any of plaintiff's subjective complaints of pain with her right or left knee.
7. On June 4, 2001, when Dr. Jones noted that having found no significant orthopedic injury based upon plaintiff's complaints, she offered plaintiff referral for a second opinion. Plaintiff was to follow-up with Dr. Jones on a prn basis pending outcome of the second opinion. Plaintiff never followed up with Dr. Jones after June 4, 2001.
8. During the period of time plaintiff was being treated by Dr. Jones she had been released to return to work on light duty, with work restrictions of no lifting, no prolonged standing or walking. This light duty work status and the same work restrictions continued for plaintiff until June 4, 2001. On June 4, 2001, Dr. Jones recommended that plaintiff be kept out of work for one week and that she resume her light duty work restrictions on June 11, 2001. According to the deposition of Dr. Jones, plaintiff's light duty work restrictions were temporary and would continue until she had seen plaintiff back on follow-up from plaintiff's second opinion. Dr. Jones expected that Plaintiff would return to work in a full duty capacity at the time she was seeing plaintiff in June 2001. Plaintiff, however, did not return for a follow-up visit with Dr. Jones after June 4, 2001. Dr. Jones, therefore, was unable to testify as to a date when plaintiff was capable of a full duty work release. However, Dr. Jones did testify that she expected plaintiff would reach maximum medical improvement within six (6) months from the date of plaintiff's initial treatment on March 12, 2001.
9. Plaintiff was seen at U.S. Healthworks Medical Group on March 14, 2001, and presented with complaints of trauma to her knees and back pain. As a result of her examination on March 14, 2001, plaintiff was taken out of work until March 21, 2001. Plaintiff was seen for follow-up at U.S. Healthworks on March 21, 2001 and based upon her examination she was released to return to work on light duty.
10. Dr. James Livingston is a family practitioner who initially saw plaintiff on March 22, 2001. Plaintiff's initial referral to Dr. Livingston was for his evaluation for high blood pressure. Following March 22, 2001, plaintiff continued her treatment with Dr. Livingston and currently treats with Dr. Livingston as her personal family physician.
11. The deposition testimony of Dr. Livingston was taken in this matter. Dr. Livingston did not want to get into a discussion concerning the area of expertise of that which properly belongs to a psychiatrist or psychologist. Dr. Livingston was not comfortable as a family practitioner with questions on the actual causation of plaintiff's anxiety and depression. He stated that anxiety and depression can be multi-factual, and can come from many different things. Dr. Livingston, knowing his limitations, would defer to the opinions of the treating physicians or psychologist concerning the causes of plaintiff's anxiety and depression, or psychological problems.
12. In his deposition testimony, Dr. Livingston confirmed that there were no objective tests or any other findings to support the belief that plaintiff was having chronic pain. Dr. Livingston did not do any testing or take any history from plaintiff to rule out what other potential sources could have caused or could be the causes for plaintiff's back complaints. Dr. Livingston did not explore these other sources which could have caused plaintiff's complaints of back pain. Dr. Livingston did not examine plaintiff's MRI, nor take a history from plaintiff about any prior injuries or other types of problems, including infections and kidney problems, and other potential causes of her back problems. Dr. Livingston confirmed that there were no independent objective findings that he had made to indicate that there was a direct correlation to the cause of plaintiff's back problems to base his opinion on.
13. The testimony of Dr. Livingston bears out that any decision he made concerning what course of treatment to recommend for plaintiff's treatment was based solely upon plaintiff's statements to him and plaintiff's needs at the time.
14. Concerning Plaintiff's treatment with Dr. Livingston, there has been no diagnosed or identified physical injury or problem. There has been no detection of anything wrong with her shoulder, knee or back other than her subjective complaints of pain. Accordingly, Dr. Livingston was unable to really know what Plaintiff's problems were. It so follows, therefore, that Dr. Livingston was unable to render opinions on causation. Moreover, the determinations made by Dr. Livingston concerning Plaintiff's work status and her ability to work were derived solely from what Plaintiff told him, and therefore, are to be given little to no weight. Consequently, Dr. Livingston's determinations to take Plaintiff out of work, beginning on May 4, 2001 and continuing, must also be given little to no weight.
15. On November 11, 2001, plaintiff presented to Dr. Kenneth Oswalt, an anesthesiologist and pain management specialist upon referral by Dr. Livingston. Dr. Oswalt concluded that there was no evidence of any impaired function and noted that plaintiff was able to perform all of the activities asked of her throughout the examination process. Although Dr. Oswalt diagnosed plaintiff with depression with an anxiety disorder, he could not state within a reasonable degree of medical probability the cause of plaintiff's depression with anxiety disorder.
16. Plaintiff returned to Dr. Oswalt on December 19, 2001 for a follow-up appointment. On that date, Dr. Oswalt concluded that plaintiff did not have any physical impairment and advised that he would not have given plaintiff any work restrictions. Further, Dr. Oswalt could not find any objective evidence or any physical problems with plaintiff at the time that he provided treatment to her. Moreover, Dr. Oswalt indicated that he believed that plaintiff had "litigation focused pain" which he felt implied that she was amplifying her symptoms in order to make her case stronger for litigation.
17. On December 21, 2001, plaintiff presented to Dr. Edward M. Crane, a pain rehabilitation psychologist pursuant to a referral from Dr. Oswalt. Dr. Crane did not administer any personality tests to plaintiff. Dr. Crane indicated that he focused on pain management, and was not focused upon the treatment of the patient's psychiatric disorders.
18. The deposition testimony of Dr. Crane was taken in this matter. A review of this testimony in its entirety reveals that Dr. Crane was unable to state to any reasonable degree of medical or scientific probability that plaintiff would not have progressed at the same rate of decompensation with or without her March 3, 2001 work occurrence. According to Dr. Crane, an opinion as to whether or not plaintiff's March 3, 2001 work event accelerated plaintiff's decompensation process would involve a fair degree of speculation to reach that conclusion.
19. On August 1, 2002, plaintiff presented to Dr. Vern Schmickley, a licensed psychologist, for an independent medical evaluation. After evaluating plaintiff, Dr. Schmickley concluded that plaintiff had some significant psychological or psychiatric difficulties. Dr. Schmickley opined that plaintiff's problems are not such that they would be expected to result from being hit in the knee in the prior year and that plaintiff's visual and auditory hallucinations are suggestive of psychosis.
20. Dr. Schmickley testified that plaintiff's type of depression, which was a major depression with psychosis, would not be causally related to a physical injury. Further, Dr. Schmickley stated that plaintiff's psychiatric problems and her knee injury are coincidental, and that she would have experienced the mental decompensation regardless whether the knee injury would have occurred.
21. Dr. Schmickley testified within a reasonable degree of scientific and psychological probability that plaintiff's emotional problems that he diagnosed are not related to her March 3, 2001 knee injury. Further, Dr. Schmickley stated within a reasonable degree of scientific and psychological probability that plaintiff's current psychological problems are caused by prior psychosocial trauma and/or biochemical and neurochemical imbalances in her brain and in her body.
22. Additionally, Dr. Schmickley testified within a reasonable degree of scientific or psychological probability that the orthopaedic injuries that plaintiff sustained could not have exacerbated or accelerated her pre-existing psychological condition. Moreover, Dr. Schmickley testified within a reasonable degree of scientific or psychologic probability that plaintiff would have developed the same condition in the complete absence of any orthopaedic or physical injury.
23. In September 2002, plaintiff began treating with Dr. Avtar Singh, a psychiatrist with Cumberland County Mental Health. Dr. Singh testified that plaintiff was experiencing ongoing repressive symptoms with psychotic features, including visual and auditory hallucinations and that she presented with a fixation on chronic pain. Dr. Singh recommended that plaintiff change her medication regimen, including an increase in her anti-depressants and anti-psychotic medications.
24. Dr. Singh admitted that psychosis with auditory and visual hallucination, as in plaintiff's case, is not caused by an industrial accident or resulting physical injury. Further, Dr. Singh explained that either genetics or chemical imbalances are the cause of psychotic episodes and that there are numerous causative factors in plaintiff's history that could be the cause of her psychotic episodes.
25. Dr. Singh could not state within a reasonable degree of medical certainty that plaintiff's work-related injury was the cause of her developing a depressive disorder. Dr. Singh also questioned plaintiff's veracity due to the problems he encountered in taking her medical history.
26. Dr. Singh also admitted that it was difficult to state within a reasonable degree of medical certainty that plaintiff would not have progressed to this point without the accident and that there is no factual basis to state that the injury accelerated the decompensation process.
27. Defendants filed an I.C. Form 60 on April 6, 2001 admitting compensability of plaintiff's injury by accident on March 3, 2001 which resulted in multiple contusions. Subsequently and on July 25, 2001, defendants filed an I.C. Form 33R, response to request that claim be assigned for hearing, and admitted compensability to plaintiff's right and left knee and back injuries.
28. During the period of time that plaintiff was being treated by Dr. Jones and Dr. Oswalt for her March 3, 2001 physical injuries, she was also being treated for these injuries by Dr. Livingston. Based upon a review of the competent and credible evidence in its entirety, and as set forth above in Findings of Facts 10-14, it is determined that greater weight be given to the determinations of Dr. Jones and Dr. Oswalt, as to Plaintiff's physical ability to work, than that of Dr. Livingston.
29. A review of the competent and credible record in its entirety reveals that following the admittedly compensable injury, plaintiff was taken out of work from March 4, 2001 until March 21, 2001. Plaintiff was placed on light duty restrictions by Dr. Jones following her examination of plaintiff on March 12, 2001. Dr. Jones continued plaintiff on light duty restrictions until June 4, 2001, when she took plaintiff out of work for one week until June 11, 2001. According to Dr. Jones, plaintiff was to resume her light duty restrictions on June 11, 2001. However, since plaintiff did not return to see Dr. Jones after June 4, 2001, Dr. Jones was unable to give a date certain as to when plaintiff would have been capable of full duty work. Based upon plaintiff's failure to return to Dr. Jones and have Dr. Jones render a follow-up assessment of plaintiff's work status, a review of the competent and credible evidence of record supports a finding that following June 11, 2001, plaintiff's light duty work status would have continued until December 19, 2001. On December 19, 2001, Dr. Oswalt determined that plaintiff was physically capable of full-duty work.
30. A review of the competent and credible evidence of record in its entirety reveals that following plaintiff's March 3, 2001 compensable injury by accident, she returned to work with defendant-employer in a light duty capacity on March 21, 2001. The defendant-employer was able to accommodate plaintiff with a job position which was suitable and within her light duty restrictions. Plaintiff continued to work in this job with defendant-employer from March 21, 2001 until May 4, 2001, when she was taken out of work by Dr. Livingston. A review of this record supports a finding that defendant-employer on May 4, 2001 continued to have a suitable job within her light duty restrictions up to December 19, 2001, when plaintiff was determined capable of full duty work.
31. Plaintiff has not returned to work with the defendant-employer, or any other employer since May 4, 2001. Plaintiff applied for and received short-term disability benefits and/or long-term disability benefits from a plan which was fully funded by the defendant-employer for a time period starting sometime in May or June 2001. Plaintiff received disability benefits from this employer funded plan for a twenty-six or twenty-seven week period of time or more, and at a sum of approximately $200.00 per week. There has been no evidence presented that following May 4, 2001 that plaintiff has made any efforts to locate and procure any employment.
32. Since defendant-employer had a position available for plaintiff which was within her work restrictions given on May 4, 2001, and that plaintiff stopped working for defendant-employer on May 4, 2001, this record supports a determination that plaintiff refused suitable employment. It so follows, therefore, that any disability that plaintiff may have as a result of her March 3, 2001 compensable injury by accident would be attributable to her refusal of suitable employment on May 4, 2001, and thereafter.
33. This record must, however, be read in its entirety in a light most favorable to Plaintiff. Such a reading reveals that plaintiff reasonably stopped work on May 4, 2001, because Dr. Livingston had taken her out of work. Plaintiff's reliance on Dr. Livingston, her personal physician, was reasonable and at this point, plaintiff should not be penalized for this. However, plaintiff was again seen at Dr. Jones' office, her orthopedic treating physician, on May 9, 2001. Based upon plaintiff's examination on May 9, 2001 she was again released to return to work on light duty with the same restrictions she had been given by Dr. Jones since March 12, 2001.
34. There has been no evidence presented that on May 9, 2001, plaintiff attempted to return to work with defendant-employer in her previous light duty job position, or that defendant-employer had refused to offer plaintiff the position. On May 9, 2001, it is determined that plaintiff's continued reliance on Dr. Livingston's work note taking her out of work, when Dr. Jones, her orthopedic treating physician, had continued her on the same light duty work status, was unreasonable and tantamount to constructive refusal of suitable employment. Therefore, any disability that plaintiff may have is attributable to refusal of suitable employment on May 9, 2001 and thereafter.
35. It is significant to note that plaintiff was represented by counsel during the above referenced period of time. A review of the I.C. Form 18 filed with the Industrial Commission by plaintiff, shows that plaintiff's representation by counsel began on April 4, 2001.
36. It is determined, based upon a review of the competent and credible evidence of record in its entirety, that plaintiff's compensable injury on March 3, 2001 resulted in disability to plaintiff from March 4, 2001 until March 21, 2001, and from May 4, 2001 until May 9, 2001, at which time she refused suitable employment with defendant-employer. Plaintiff was again disabled from June 4, 2001 until June 11, 2001, when she was taken out of work again by Dr. Jones.
37. In addition to the testimony given at this hearing and along with the other record evidence, there were seven (7) medical depositions taken in this matter. Five (5) out of these seven (7) medical depositions were taken on behalf of plaintiff.
38. It is clear from a reading of the deposition testimony given in this matter, especially the cross-examination, that this testimony failed to meet the reasonable degree of medical certainty standard necessary to establish a causal link between plaintiff's March 3, 2001 compensable injury and her mental condition of anxiety and depression, or other psychological disorders. The medical testimony given on the issue of causation of plaintiff's medical condition, taken as a whole, is based merely upon speculation and conjecture and not sufficiently reliable to qualify as competent evidence tending to show a proximate causal relation.
39. After giving due consideration to plaintiff's testimony, the evidence of record including the medical evidence, and the testimony given by depositions, greater weight is given to the medical evidence which does not support or corroborate plaintiff's allegations that her March 3, 2001 compensable injury by accident caused, accelerated or aggravated Plaintiff's anxiety and depression, or other psychological disorders.
40. Plaintiff has failed to prove by the greater weight of the competent credible evidence and medical evidence of record that her March 3, 2001 injury by accident caused, accelerated or aggravated Plaintiff's anxiety and depression, or other psychological disorders.
41. Plaintiff has an average weekly wage of $404.31, which yields a compensation rate of $269.56.
42. Plaintiff is entitled to have defendants provide all medical treatment necessitated by her March 3, 2001 injury by accident, which resulted in physical injuries to plaintiff, including both her knees and her back. This medical treatment shall include treatment provided by Dr. Livingston, where such treatment involved plaintiff's complaints of physical injuries, including her knees and back.
43. Plaintiff has received approximately $200.00 per week of short term disability and/or long term disability benefits pursuant to a plan that was fully funded by defendant-employer.
44. Plaintiff did not prosecute or bring this case without "reasonable grounds" for doing so, and this case involved a legitimate evidentiary dispute on the issue of plaintiff's mental condition and disability.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On March 3, 2001, plaintiff sustained an injury by accident resulting in physical injuries, including both her knees and her back. N.C. Gen. Stat. § 97-2(6).
2. As a direct and proximate result of plaintiff's March 3, 2001 injury by accident and her resulting medical conditions, she was disabled from March 4, 2001 until March 21, 2001, when she returned to work for defendant-employer in a suitable light duty job, and from May 4, 2001 until May 9, 2001, when plaintiff refused suitable employment with defendant-employer. Plaintiff was again disabled from June 4, 2001 until June 11, 2001, at which time she was able to return to work with defendant-employer. N.C. Gen. Stat. § 97-32.
3. As a direct and proximate consequence of plaintiff's compensable injury by accident, plaintiff is entitled to temporary total disability compensation at a rate of $269.56 from March 4, 2001 until March 21, 2001, May 4, 2001 until May 9, 2001, and June 4, 2001 until June 11, 2001. N.C. Gen. Stat. § 97-29.
4. Plaintiff has failed to prove by the greater weight of the competent credible evidence and medical evidence of record that her March 3, 2001 injury by accident caused, accelerated or aggravated her mental condition of anxiety and depression, or other psychological disorders. N.C. Gen. Stat. § 97-2(6).
5. Plaintiff is entitled to have defendants provide all medical treatment necessitated by her March 3, 2001 injury by accident, which resulted in physical injuries to plaintiff including both her knees and her back. This medical treatment shall include treatment provided by Dr. Livingston, where such treatment involved plaintiff's complaints of physical injuries, including her knees and back. N.C. Gen. Stat. §§ 97-2(19) 97-25.
6. Defendants are entitled to a credit for short-term disability and/or long-term disability benefits received by Plaintiff from a program fully funded by defendant-employer. N.C. Gen. Stat. § 97-42.
7. Neither party has shown that the other party litigated this proceeding without reasonable grounds for doing so. Therefore, no attorneys' fees are imposed pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Subject to the credit owed defendants and to the attorney's fee approved herein, defendants shall pay temporary total disability compensation to plaintiff at a rate of $269.56 per week from March 4, 2001 until March 21, 2001, May 4, 2001 until May 9, 2001, and from June 4, 2001 until June 11, 2001. Such amount that has already accrued shall be paid in a lump sum, and all amounts shall be subject to a reasonable attorney's fee hereinafter approved in Paragraph #2.
2. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due plaintiff under Paragraph #1 of this award is approved for plaintiff's counsel and shall be paid by defendants directly to Plaintiff's counsel.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury so long as it tends to effect a cure and give relief or lessen plaintiff's disability.
4. Plaintiff's claim that her mental condition of anxiety and depression, or other psychological disorders and disability are causally related to her March 3, 2001 compensable injury by accident is hereby DENIED.
5. Defendants shall pay the costs.
This the 17th day of November, 2004.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER